Filed 11/5/21  In re Gavin R. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re GAVIN R., a Person Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, Plaintiff and Respondent, v. AMANDA R., Defendant and Appellant. | F082895 (Stanislaus Super. Ct. No. JVDP-19-000123) **OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Stanislaus County.  Annette Rees, Judge.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Boze, County Counsel, and Lindy GiacopuzziRotz, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Appellant Amanda R. challenges the juvenile court's determination that the beneficial parent-child relationship exception to adoption did not apply to the circumstances of her dependency case. (See Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)[1] We reject her claim and affirm.

## FACTS

### *Circumstances Surrounding Removal*

In February 2019, the Stanislaus County Community Services Agency (Agency) received a referral alleging Amanda R. (Mother) and her newborn, Gavin R. tested positive for methamphetamines and opiates at Gavin's delivery the day prior. Mother admitted to using methamphetamine daily during her pregnancy with Gavin. However, toward the end of the pregnancy, Mother claimed she reduced her methamphetamine use to "a few times a week." Previously, Mother would take 10 to 12 Vicodin pills per day but reduced to "a few pills per day" near the end of the pregnancy.

Mother stated she lives with her new boyfriend, Scott A. and his father, Charles. Scott A. told social workers he uses methamphetamine three to four times per week.

Mother expressed interest in voluntary family maintenance services (see § 16056, subd. (b)) and signed a family agreement. Under the family agreement, Mother agreed that neither she nor Scott A. could be with Gavin unsupervised unless approved by a social worker. Scott A. and his father, Charles, both signed the family agreement. Charles agreed to contact the social worker if he saw Mother or Scott caring for Gavin while under the influence.

On March 14, 2019, a social worker conducted an unannounced visit to the residence of Charles and Scott A., where Mother was staying with Gavin. The home was dirty with trash, clothes and food "everywhere." The social worker told Scott that she had tried to contact Mother several times without success. Scott said Mother was at the

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

Department of Motor Vehicles with Gavin. The social worker said the family agreement was being violated since Charles was supposed to be supervising them.

The next day, a social worker conducted another unannounced visit. The home was still dirty. According to the social worker, Mother was not participating in services, nor staying in contact with the social worker, and was in violation of the family agreement. Mother took a drug test that was positive for benzodiazepines and oxycodone. Mother said she was taking Vicodin because she delivered via C-section. Mother's test also produced faint lines for methamphetamine and amphetamine.

On April 15, 2019, a social worker visited the home and found it to be clean. Mother and Scott reviewed and signed a family maintenance case plan.

In May 2019, a social worker attempted to contact Mother and Scott on several occasions. On May 23, 2019, emergency response social workers went to the home. Charles said Mother and Scott no longer lived with him. Charles referred the social worker to an apartment complex.

Social workers responded to the apartment complex and contacted Mother and Scott. Mother said she was using methamphetamine daily and had used the previous night. Social workers took Gavin into protective custody.

### Initiation of Dependency Proceedings

On May 28, 2019, the Agency filed a dependency petition pertaining to Gavin, who was two months old at the time. The petition alleged Gavin had suffered, or is at substantial risk of suffering, serious physical harm or illness due to the inability of the parent to provide regular care for the child due to the parent's mental illness, development disability, or substance abuse.[2] (See § 300, subd. (b)(1).)

---

[2] As to the alleged father, Jason M., the petition alleged that because his whereabouts were unknown, he was unwilling or unable to provide for care of Gavin. (See § 300, subd. (g).)

At a detention hearing on May 29, 2019, the court ordered Gavin detained. On June 21, 2019, Gavin was placed with a foster family in the county. The foster family reported Gavin was "doing well in placement and has been able to adjust appropriately." Gavin was "bonding well with the family" and he was "happy in the home."

*July 12, 2019 Report*

In a report filed July 12, 2019, a social worker stated that, after the detention hearing, Mother had demonstrated only "limited" efforts to engage in substance abuse treatment. After completing an initial assessment, Mother was referred to a sober living facility but "left treatment less than 24 hours later." She then missed two appointments with a substance abuse counselor. Mother had not reentered substance abuse treatment by the time of the report.

The report also stated that Mother's "interaction and parenting skills" at weekly visits were "appropriate."

*August 7, 2019 Hearing*

At a hearing on August 7, 2019, Mother's counsel asked for a one-week continuance. Counsel represented that "after this hearing today, [Mother is] going to go to the agency, test for them, and meet with the SUD assessor …." The court continued the hearing to August 21, 2019. However, Mother did not go to the Agency and test or meet with the SUD assessor with that day; nor did Mother appear at the continued hearing on August 21, 2019.

*September 4, 2019 Hearing*

At a hearing on September 4, 2019, Mother's counsel provided an offer of proof: If Mother were called to testify, "she would absolutely say that she did, in fact, test for the Agency last week," and that she made "contact with the social worker, and that contact was not recorded here in this report." The court accepted the offer of proof as evidence.

The court found the allegations of the petition to be true by a preponderance of the evidence. The court ordered Gavin removed from Mother's custody. The court granted services to Mother.

### February 7, 2020 Report

In a report filed February 7, 2020, the Agency recommended terminating Mother's reunification services. Mother claimed she completed hair follicle drug tests on December 30, 2019, and on January 24, 2020. However, the lab reported that Mother had, in fact, been a " 'no show' " to both appointments for testing. Mother did attend her parenting classes and individual counseling sessions.

Mother visited Gavin two hours per week. The visits were described as "appropriate." The report noted that Mother would read to Gavin, provide age-appropriate toys and feed him. Mother wanted to visit Gavin more, but the social worker was reluctant to consider that because Mother failed to drug test.

### Incident Report

In March 2020, the Agency filed an incident report from Nirvana Drug & Alcohol Treatment Institute. The incident report stated that on March 12, 2020, Mother completed an intake appointment. When Mother was asked to drug test, "she immediately stated, 'I can't test, I have to go meet with my lawyer!' " Mother was directed to return the next morning to drug test, but she did not do so.

### Agency's Change of Recommendation

At a hearing on May 27, 2020, counsel stated the Agency changed its position and was now recommending continuing reunification services for Mother until July 23, 2020. At a hearing a few weeks later, on June 17, counsel clarified that the Agency decided not to recommend terminating services due to delays arising from COVID-19. The Agency "remains concerned about the mother's consistent refusal to test."

*July 6, 2020 Report*

In a report filed July 6, 2020, the Agency recommended continuing services for Mother.

The report noted Mother had failed to drug test on June 22 and 24, 2020. Mother said she was "unable to attend" the first test, and claimed she wrote down the wrong date for the second test.

All in person visits were cancelled due to COVID-19, so Mother had been visiting with Gavin weekly through video conference. Mother was loving and demonstrated age-appropriate parenting skills during the visits.

On August 5, 2020, the court ordered continued reunification services for Mother.

The Agency filed an updated case plan on August 7, 2020, stating that Mother's individual counseling should focus on several issues, including "patterns of dishonesty, and patterns of unhealthy lifestyle choices including remaining in a relationship with someone who continues to use substances."

*October 22, 2020 Report*

In a report filed on October 22, 2020, the Agency recommended terminating Mother's reunification services.

A nurse practitioner from Cognitive Health Solutions stated Mother had not been seen since July 17, 2020, having cancelled appointments on August 2 and 14, 2020.

Mother's attendance at individual counseling was spotty, having missed sessions on July 14 and 21, 2020.

At a visit on August 12, 2020, Mother "appeared hot and sweaty" but her body temperature was 98.6 degrees. By the end of the visit, Mother was sweating "profusely," and the back of her shirt was "all wet." Several other visits were reported to have gone well, with Mother engaging Gavin with books and toys.

Mother cancelled a visit on July 22, 2020, because of "court."

Mother was a "no show" for drug tests on July 24, September 9 and 28, and October 5, and 13, 2020. The social worker sent text messages to Mother on the day of the test, reminding her of the time and location of tests. The social worker stated a "no show" test would "count as a positive" test.

*November 25, 2020 Report*

In a report filed November 25, 2020, the Agency continued to recommend termination of Mother's reunification services. Mother failed to show for drug tests on October 28, November 16 and 23, 2020.

After September 9, 2020, Mother stopped responding to text messages from the social worker. However, Mother would send "random" e-mails to the social worker claiming she was unable to contact the social worker, but with no proof of such attempts. Mother failed to attend a child-family-team meeting on October 21, 2020, even though the date had been confirmed by Mother.

The visitation center informed the social worker that it could not reschedule visits between Mother and Gavin because Mother provided a very limited schedule. Mother would claim she could not do a morning visit because she had an appointment in the afternoon. Mother also showed "a pattern of late cancellations" of visits.

During a visit on November 23, 2020, Gavin became "fussy" towards the last half of the visit. The observing social worker noted Gavin "appeared to be uninterested in being in the visit for the last half of the visit." When the social worker told Gavin the visit was over, he stopped fussing.

*December 2, 2020 Hearing*

At a hearing on December 2, 2020, Mother's counsel claimed she was willing to test. The social worker confirmed she could test that Friday, and Mother confirmed she was available to do so.

*December 30, 2020 Report*

In a report filed December 30, 2020, the Agency continued its recommendation to terminate mother's reunification services. The report explained that Mother did not show for the test on December 4, 2020. She also did not show for drug tests on December 11, 22, and 28.

*18-Month Review Hearing*

The 18-month review hearing was held on January 13, 2021.

Mother testified that she had been taking antidepressant medications since "a few months after this case began."

Mother explained how COVID-19 affected her visitation with Gavin. Half of her visits were in person and half were now over Zoom. Mother felt she did not have enough time to bond with him. She also believed it was difficult for Gavin to adjust to Zoom.

Mother claimed that she did test on the Friday after the last hearing in December, despite the social worker's report saying otherwise. Mother said she had "copies" of a receipt from the testing center, but they were in her car which had broken down about 10 minutes from the courthouse. The court told Mother's counsel it was willing to give them 30 minutes to retrieve the documents. The reporter's transcript notes that two "discussion[s]" occurred but does not transcribe them. When court resumed, 36 minutes had passed.[3] Mother's counsel asked Mother if she had the receipt from the December 4 drug test. Mother responded she did not have the receipt, but only because she grabbed the wrong folder.

The court found that Mother had chosen not to participate in the drug testing element of her case plan, despite being given "opportunity after opportunity after

---

[3] The Agency claims in its appellate brief that during the "recess," the "social worker drove mother back to her car to get the backpack with the alleged proof of testing." However, the cited portion of the reporter's transcript does not affirmatively show this occurred. Counsel for the Agency did not ask Mother any questions and did not put the social worker on the stand.

opportunity." The court further found that Mother's progress to alleviating or mitigating the causes necessitating placement has been "poor." The court terminated Mother's services.[4]

### Section 366.26 Report and Hearing

On April 7, 2021, the Agency filed its section 366.26 report, which recommended terminating Mother's parental rights.

The Agency recommended establishing a permanent plan of adoption by Gavin's foster parents. Gavin had been with the foster parents since June 21, 2019. The foster parents had shown they were able to meet Gavin's medical, developmental, and emotional needs. The report noted Gavin "has shown his strong attachment to both [foster parents] through greetings, affection and seeking attention." The social worker observed that the foster parents' home was "the only stable environment that Gavin has known, and it would be in the best interest to remain in their care."

Mother visited with Gavin on February 26, and March 26, 2021. Both visits were "appropriate."

At the section 366.26 hearing on June 4, 2021, Mother's counsel moved to return Gavin to her care and to terminate the dependency proceedings. Mother's counsel made an offer of proof that: Mother completed a parenting class as of January 1, 2020; she was regularly attending Narcotics Anonymous and Alcoholics Anonymous meetings; and had participated in several sessions with "Sierra Vista"[5] in 2021. The court denied the motion.

---

[4] A notice of appeal and a notice of intent to file writ petition concerning these orders were filed in this court on January 20, 2021. Both actions were subsequently dismissed.

[5] Elsewhere in the record, it appears that Sierra Vista Child & Family Services offers a Family Maintenance and Reunification Program that includes a clinical assessment, individual counseling and a positive parenting program.

9.

With respect to the section 366.26 hearing, the Agency submitted on its report. Mother testified on her own behalf. Mother described her relationship with Gavin as a "strong bond." She testified that after seeing Gavin for the first time in a few months, he held onto her for "like 18 minutes."

Mother said she wanted to have more than monthly visits. At the end of one visit, when it was time to clean up, Gavin threw a "big fit." Mother told him he needed to have the toys ready for next time. Gavin replied, " 'No, you no see me anymore, no play.' "

In argument to the court, counsel for the Agency observed that Mother did not prove that terminating her rights would be detrimental to Gavin. Counsel acknowledged that Mother participated in visitation but argued that Gavin was "extremely bonded to his current caregivers who have been providing a very loving and stable home for him for almost the entirety of his life, and so, therefore, a significant part of his life was not spent with either of the parents here." Gavin's counsel agreed with these contentions.

Mother's counsel conceded that Gavin was generally and specifically adoptable but argued that he would suffer detriment if his bond with Mother was severed.

The court concluded the beneficial parent/child relationship exception does not apply. The court stated it was "mindful" of the recent Supreme Court decision in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), which required three elements to establish the beneficial parent/child relationship exception. The court concluded Mother had regularly visited and contacted Gavin but found that the termination of parental rights would not be detrimental to Gavin. The court noted that Gavin was "very bonded to his caretakers" and that he had been in their home "for almost his entire life." Consequently, the permanency and stability of adoption was "of such benefit that it outweighs" the potential detriment from the termination of parental rights. The court terminated Mother's parental rights.

Mother appeals.

DISCUSSION

## I. Mother has not Established Reversible Error

### A. *Law*

The beneficial parent/child relationship exception to adoption applies where "[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to … the … circumstance[] [that] [t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) This provision establishes three elements a parent must prove to establish the exception: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.)

"When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)

With respect to the third element, we review the court's factual determinations for substantial evidence. We review the court's weighing of the benefits of adoption against the harms that may arise from severing the parent/child relationship for abuse of discretion. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

### B. *Analysis*

Mother contends the trial court erred in finding that the beneficial parent/child relationship exception to adoption did not apply. She argues that because she had limited opportunities to visit or "care" for Gavin, it was "inappropriate" for the court to compare the care Gavin was receiving from his foster parents to his relationship with Mother. The court's consideration of these factors was not inappropriate. Indeed, the third element of the exception calls for courts to consider things like "the child's relationship with [the] parent" and "how a prospective adoptive placement may … counterbalance" harms that

might stem from severing the parental relationship. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) Here, the court properly considered the extent of Gavin's bond to Mother and weighed it against the benefits of Gavin being adopted by his foster parents.

What would have been inappropriate is if the court had compared the care Gavin received from his foster parents with *the care Mother could have offered*. (See *Caden C.*, *supra*, 11 Cal.5th at p. 634.) But that is not what the court did. Instead, the court cited Gavin's bond with his foster parents in order to weigh the benefits of adoption against the potential detriment from terminating parental rights. And the court's ruling appropriately focused on any potential *bond* between Mother and Gavin, and *not* on how well Mother could have *cared* for Gavin herself. (*Ibid.*)

Indeed, the court found that Gavin and Mother did have a bond. However, the court ultimately concluded that that bond did not outweigh the benefits of adoption and that, therefore, terminating parental rights would not be detrimental to Gavin. Mother offers no reason to question or undermine the court's reliance on the benefits that would accrue to Gavin if he were adopted. Mother has not established error.

## DISPOSITION

The juvenile court's orders are affirmed.



POOCHIGIAN, ACTING P. J.

WE CONCUR:



SMITH, J.



SNAUFFER, J.

12.